## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD TABAS<br>737 Montgomery Avenue<br>Narberth, PA   19072<br>INDIVIDUALLY AND ON BEHALF OF ALL<br>OTHERS SIMILARLY SITUATED,<br><br>                              Plaintiff,<br><br>    v.<br><br>GUITAR CENTER, INC.<br>5795 Lindero Canyon Road<br>Westlake Village, California 91361;<br><br>YAMAHA CORPORATION OF AMERICA<br>6600 Orangethorpe Ave.<br>Buena Park, California 90620;<br><br>FENDER MUSICAL INSTRUMENTS<br>CORPORATION<br>8860 East Chaparral Road, Suite 100<br>Scottsdale, Arizona 85250;<br><br>GIBSON GUITAR CORPORATION<br>309 Plus Park Boulevard<br>Nashville, Tennessee 37217;<br><br>NATIONAL ASSOCIATION OF MUSIC<br>MERCHANTS, INC.<br>5790 Armada Drive<br>Carlsbad, California 92008;<br><br>AND,<br><br>  JOHN DOES 1-100<br><br>                              Defendants. | Civil Action No. |

## CLASS ACTION COMPLAINT

Plaintiff Richard Tabas ("Plaintiff"), individually and on behalf of all others similarly

situated, by his undersigned attorneys, brings this action for damages and injunctive relief under the

antitrust laws of the United States against the Defendants identified herein, and in connection therewith alleges as follows:

## NATURE OF THE ACTION

1.    This action is brought as a class action on behalf of individuals and entities who purchased new guitars in the United States, both acoustic and electric ("Guitars"), manufactured by Yamaha Corporation of America ("Yamaha"), Fender Musical Instruments Corporation ("Fender"), and Gibson Guitar Corporation ("Gibson")(collectively "Guitar Manufacturers") directly from members of the National Association of Music Merchants, Inc. ("NAMM"), including Guitar Center, Inc. ("Guitar Center") and JOHN DOES 1-100 (collectively "Guitar Retailers") (Yamaha, Fender, Gibson, Guitar Center, NAMM, and JOHN DOES 1-100 are collectively referred to as "Defendants"), during the period covering from as early as January 2005 through the present ("the Class Period"). Plaintiff seeks damages and equitable relief from Defendants under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. As detailed below, Plaintiff alleges that NAMM and Defendant Guitar Manufacturers and Guitar Retailers conspired and agreed with and among each other to sell guitars at, and/or not to discount off of, minimum advertised prices ("MAP"), which were set and enforced by Defendant Guitar Manufacturers, for the purpose of restricting retail competition, and raising and maintaining higher retail prices of new Guitars.

## DEFINITIONS

2.    "MAP" refers to minimum advertised prices. These are typically price floors set by the Manufacturer Defendants below which the Retailer Defendants are not supposed to advertise. Here, MAP is also the price which the Retailer Defendants agreed not to sell below

2

and/or not to discount off of. MAP prices are generally lower than Manufacturer Suggested

Retail Price or "MSRP."

## JURISDICTION AND VENUE

3.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable

attorneys' fees for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15

(a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United

States.

4.    Venue is proper in this federal judicial district under 15 U.S.C. § 15(a) because

Defendants reside, or are found, or have an agent here. Alternatively, venue is proper in this

judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391

(b) and (c) because during the Class Period, Defendants resided, transacted business, were found,

or had agents in this district, and because a substantial part of events giving rise to Plaintiff's

claims occurred, and a substantial portion of the affected interstate trade and commerce described

below has been carried out, in this district.

5.    The Court has personal jurisdiction over Defendants pursuant to Section 12 of the

Clayton Act, 15 U.S.C. § 22.

## PARTIES

A.    **Plaintiff**

6.    Plaintiff Richard Tabas is a resident of Pennsylvania and purchased a new Fender

Guitar from Defendant Guitar Center during the Class Period, and was thus injured by

Defendants' conduct.

**B.      Defendants**

7.      Defendant National Association of Music Merchants, Inc. ("NAMM") is a corporation duly organized and existing under the laws of the State of New York with a principal place of business located at 5790 Armada Drive, Carlsbad, CA 92008.

8.      Defendant Guitar Center, Inc. ("Guitar Center") is a corporation duly organized and existing under the laws of the State of Delaware with a principal place of business located at 5795 Lindero Canyon Road, Westlake Village, CA 91362.  It is the largest retailer of musical instruments, including Guitars, in the United States.  Its wholly owned subsidiary, Musician's Friend, Inc., is the largest direct response retailer of musical instruments in the United States through its catalogs and e-commerce website.  The sale of Guitar Center to Bain Capital Partners was completed on October 9, 2007.

9.      Defendant Yamaha Corporation of America ("Yamaha") is a corporation which manufactures Guitars and is duly organized and existing under the laws of the State of California with a principal place of business located at 6600 Orangethrope Avenue, Buena Park, CA 90620.

10.      Defendant Fender Musical Instruments Corporation ("Fender") is a corporation which manufactures Guitars and is duly organized and existing under the laws of the State of Delaware with a principal place of business located at 8860 E. Chaparral Road, Suite 100, Scottsdale, AZ 85250.

11.      Defendant Gibson Guitar Corporation ("Gibson") is a corporation which manufactures Guitars and is duly organized and existing under the laws of the State of Delaware with a principal place of business located at 309 Plus Park Boulevard, Nashville, TN 37217.

**C.     Un-Named Defendant Co-Conspirators**

12.     Defendants JOHN DOES 1-100 are various other persons, partnerships, sole proprietors, firms, corporations and/or entities not identified or named as defendants in this Complaint, who participated as co-conspirators with Defendants in the offenses charged herein by entering into the Agreement with Defendants in restraint of trade as described herein.

## INTERSTATE TRADE AND COMMERCE

13.     The activities of Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

14.     During the time period covered by this Complaint, Defendants sold and distributed new Guitars throughout the United States.

15.     Defendants have sold and shipped substantial quantities of new Guitars in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants produced new Guitars.

## FACTUAL ALLEGATIONS

**NAAM**

16.     Founded in 1901, NAMM considers itself to be the trade association of the music products industry.  With several thousand members in the U.S., including manufacturers, distributors and retailers, NAMM's basic mission is to unify, lead and strengthen the music products industry in the U.S.

17.     NAMM hosts frequent trade shows, events and meetings which allows its members to gather in one forum for both public and closed/private meetings.

18.    In addition to promoting the music industry, NAMM serves its individual members by publishing comprehensive industry statistical reports, such as their annual "Music USA, A Statistical Review of the Music Products Industry" report.

19.    According to NAMM, guitars are the largest product category in the overall musical instrument industry by a fairly wide margin.

**The Guitar Market**

20.    In 2006, the value, at wholesale, of the total guitar market was approximately $750 million, with an approximate retail value of $1.1 billion.

21.    In 2004, the five leading music product retailers accounted for 32.8% of estimated total sales according to Guitar Center's Annual Report and 10-K dated March, 2007.  As of 2005, Guitar Center grew to control approximately 40% of all retail music instrument sales.  Its sales are more than four times the size of its closest competitor.  As of 2008, Guitar Center had almost 50% of the total sales of the top 200 largest retailers of musical instruments as listed by *Music Trades, August, 2009*.  Guitar Center maintains no long term contracts with its suppliers, which provides it leverage.  As such, Guitar Center has market power with respect to its manufacturer suppliers, including the Manufacturer Defendants.  In addition, through its Musician's Friend subsidiary, Guitar Center was represented on the NAMM Board of Directors in 2005-2006.

22.    In a January 5, 2006 article in the *Los Angeles Times*, it was estimated that Fender had $380 million in Guitar and related equipment annual sales while Gibson had $280 million worth of annual sales.  Further, according to *Music Trades, April* 2007, in 2006 Yamaha was the leading musical instrument supplier in the world, with Fender third and Gibson sixth.  These

three Manufacturer Defendants dominate sales of new guitars in the U.S. In addition, Fender was represented on the NAMM Board of Directors in 2005-2006.

23.    Guitars manufactured by the three Manufacturer Defendants, Fender, Gibson and Yamaha, are considered differentiated products in the industry. In other words, consumers generally perceive these guitars as being "better" than other brands of guitars and, thus, are willing to pay a premium price for such guitars over and above the price of an otherwise comparable guitar made by another manufacturer. Product differentiation insulates these guitars from price competition, to some extent, and in addition, serves as a barrier to entry into the market, in that new guitar manufacturers would have difficulty competing even at much lower price levels.

24.    In the eleven-year period leading up to the Class Period, the guitar industry saw a significant increase in unit volume sales. The number of units sold between 1994 and 2004 increased over 200 percent.

25.    As indicated in the chart below, the number of guitar units sold leveled off in 2005, and a significant sales decline began in 2006 (-9.6 percent). This decline has continued to the present.



**Unit Volume: Total Guitar Industry**
1994 - 2006

Sources: 2007 Music Industry Census, p. 84, 2004 Music Industry Census, p. 74

26.    While the demand for guitars increased steadily through 2004, the estimated average selling price of guitars steadily decreased from 1997 to 2004. This situation was frustrating for retailers in the industry, and by extension their manufacturer-suppliers, as the increase in demand did not translate into higher prices.

27.    The decrease in average unit prices for guitars can be, in part, explained by a steady increase in the importation of lower priced Chinese-made guitars. According to the Music Industry Census 2009, the average unit price for guitars plummeted to $309 in 2004, down from $529 in 2001-2002.

28.    From 2005 through 2007, the negative pricing situation was reversed, due to the collusive activities of Defendants, as described in detail below. While demand decreased during

8

this time and the influx of cheap Chinese imports continued, the average unit prices of guitars now rose significantly. This pricing behavior is at odds with standard economics, since a decline in demand, along with the continued importation of low-priced Chinese imports, would normally have led to a decline in price in a competitive market. However, this was not the case.

29.    The percentage change of the average selling prices of guitars was greater as compared to the percentage change in average selling prices of all other instruments in the music instrument industry. In 2004, the percent change in the average selling prices of guitars was negative 19.9 percent, well below the industry average of negative 7.0 percent of all other instruments in the music instrument industry. However, in 2005, the percent change in average selling price of guitars increased by 13.3 percent, well above the industry average of negative 3.2 percent. The percentage change in the average selling prices of guitars (6.3 percent) stayed above the industry average (3.8 percent) in 2006 as well, according to industry statistics represented in the chart below.



Source: 2007 Music Industry Census, p. 84.

30.     NAAM and the other Defendants, all members of NAMM, were spurred to action by the rapid downslide in pricing for Guitars in 2004.  As have many other trade associations in antitrust lore, NAAM proceeded to facilitate discussions among its members to prop up Guitar pricing by preventing discounting off of MAP, and thus avoiding retail price competition.  The higher MAP agreed to by Defendants and charged by Defendant Retailers allowed Defendant Manufacturers to increase their wholesale prices to the Defendant Retailers.

**FTC Findings**

31.     On April 8, 2009 the FTC issued its Decision and Order in *In the Matter of National Association of Music Merchants, Inc.* (Docket No. C-4255).   The FTC Complaint, also dated April 8, 2009, stated in part:

> …NAMM's trade shows provide competitors an opportunity to
> meet and discuss issues of concern to the industry…

An ongoing subject of concern in the musical instruments industry has been the increased retail price competition for musical instruments…

Between 2005 and 2007, NAMM organized various meetings and programs at which competing retailers of musical instruments were permitted and encouraged to discuss strategies for implementing minimum advertised price policies, *the restriction of retail price competition and the need for higher retail prices* (emphasis added). Representatives of NAMM determined the scope of discussion by selecting moderators and setting the agenda for these programs.  At these NAMM-sponsored events, competitors discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and working of such policies; appropriate and optimal retail prices and margins; and other completely sensitive issues.

In many instances, the exchange of information and opinion arranged by NAMM…*served no legitimate business purpose for NAMM or its members* (emphasis added).
The exchange of information among NAMM members, as alleged herein, had the purpose, tendency, and capacity to facilitate collusion and to restrain competition unreasonably.

32.    The FTC's Decision and Order required NAMM to cease and desist from:

[u]rging, encouraging, advocating, suggesting, coordinating, participating in or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to: the retail price of Musical Products; or any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

Entering into, adhering to, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding

between or among any Musical Product Manufacturers or Musical
Product Dealers relating to: the retail price of any Musical Product;
any term, condition or requirement upon which any Musical
Product Manufacturer or Musical Product Dealer deals, or is
willing to deal, with any other Musical Product Manufacturer or
Musical Product Dealer, including but not limited to Minimum
Advertised Price Policies, or Resale Price Maintenance Policies; or
the refusal to do business, or the reduction of business, with
particular Musical Product Manufacturers or Musical Product
Dealers.

33.    In conjunction with its case against NAMM, the FTC issued subpoenas to Guitar

Manufacturers Yamaha, Fender, Gibson, and also to Guitar Center.  The FTC has withheld

disclosure of information related to the manufacturer and retailer subpoenas based, in part, on

possible interference with current law enforcement activities related to the Defendants.

**The Price Fixing Agreement**

34.    To address their "concern" with the "increased retail price competition for musical

instruments," NAAM "encouraged" discussions at NAMM meetings among the Manufacturer

and Retailer Defendants (including John Doe Defendants and unnamed co-conspirators),

including Guitar Center, the largest retailer in the U.S., for the purpose of reaching an agreement

on a mechanism to raise new Guitar retail prices.

35.    These NAMM-encouraged discussions about "implementing minimum advertised

price policies, the restriction of retail price competition and the need for higher retail prices" led

to the price-fixing agreement which is the subject of this complaint.

36.    NAMM and its retailer members, including Guitar Center, knew that retail price

erosion had to be stopped.  In order to achieve this goal, NAMM, the Manufacturer Defendants,

Guitar Center, and other currently unnamed Retailer Defendants agreed that MAP would be set at

higher levels and enforced by the Manufacturer Defendants, and adhered to and not discounted off of by the Retailer Defendants. This agreement was established to minimize retail price erosion and to assist in raising retail new Guitar pricing for the benefit of NAMM and its Retailer Defendant members.

37.    The three Manufacturer Defendants benefited from this price-fixing agreement in the following ways: 1) it allowed them to keep their retail dealers, who sell their guitars, financially solvent, 2) they were able to avoid price erosion on their differentiated products, and thus avoid damage to their brand name prestige, and 3) the higher retail prices allowed them to charge higher wholesale prices for their guitars.

38.    While MAP policies had been in place well before the class period, Defendants felt that a) they had been set too low, as outlined in a survey conducted by *Music Trades Magazine, August* 2006, and b) that they had been weakly, or not at all, enforced by the Manufacturer Defendants. Normally, retailers have little choice but to honor manufacturer policies on MAP-otherwise the risk they run is being cut off from Guitar supplies and being delisted as an authorized distributor.

39.    As a result of the NAMM meetings, the Defendants reached an agreement whereby the Manufacturer Defendants agreed to set MAP at higher price levels and enforce those levels, and the Retailer Defendants agreed to sell new Fender, Gibson and Yamaha Guitars at the MAP price, and/or not discount off the MAP price.

40.    NAMM has seen steady erosion in its retailer member base from year-to-year. In 2005 a drop to approximately 3,000 music retailers in the U.S. had occurred while the number of Guitar Center stores steadily increased from year-to-year. NAMM and the other Defendants saw

the new MAP agreement as a way to limit retail price competition, to stabilize and raise retail prices, and to ensure that the retailers stayed financially solvent.

41.    A Roundtable discussion of dealers conducted by *Music Trades* in February 2007 highlighted that retailers knew MAP was a device to limit competition and to prop up retail Guitar prices.

42.    For example, as part of the Roundtable discussion, George Hines, of George's Music Stores located in Berwyn, PA, and a member of NAMM's Board of Directors in 2004, stated that the industry's "great challenge" was to get "all distribution channels [independents, national chains, mass merchants and internet providers] working together for the health of the industry." He felt MAP could be the answer to keeping the industry profitable as long as retailers and suppliers understood each others' needs in setting the best MAP pricing. He stated that allowing market forces to control the industry would "not necessarily be for the better" and that what was needed was a "joint effort" to keep independents as the "heart and soul" of the industry with "manufacturer support." He noted that the internet had commoditized products and pricing in the music industry.

43.    Also during the Roundtable, Frank Hayhurst of Zone Music in Cotati, CA stated that manufacturers would follow the lead of Guitar Center. He urged retailers to join together with those "whom they used to consider their 'competitors' and create strategic alliances for their mutual benefit."

44.    As to MAP, Hayhurst stated as follows: "Some very clever work was done suggesting a sliding scale of much higher MAPs on lower price point products, higher MAPs on medium price point products, and slightly higher MAPs on higher cost products. The common

theme is that MAPs need to go up, but everyone is afraid to do that because some other manufacturer might not. The solution? Independents need to band together and favor manufacturers that provide a MAP system that allows for independents to stay in business."

45.    As part of the same Roundtable, Kevin Jones of Gelb Music in Redwood City, CA recognized that the days were over where retailers who offered a lot of service could expect higher prices-a recognition of the commoditization of products and pricing and a need to find common ground.

46.    In furtherance of the conspiracy, Guitar Center, as the retail market leader, threatened to punish deep discounting retailers with a low price guarantee. Guitar Center is able to make the guarantee that its price will not be beaten because of the agreement among the Defendants that Guitar retail sales will be at MAP. Best price policies are used by retailers to police the market. Once matched, prices quickly fall back into line. Small Guitar retailers are thus able to compete with the larger retailers and the margins of all Guitar retailers benefit due to the MAP agreement.

47.    In furtherance of the conspiracy, Defendants also agreed to position MAP as a deep discount off of MSRP rather than engage in the practice of discounting off of MAP. As a result, MAP became the industry standard for pricing.

48.    As part of the agreement, and to help to solidify the MAP-based price-fixing agreement, Guitar Center ordered its stores to stop discounting off of MAP, mandating that any store that made any sale below MAP had to justify it in writing.

49.    Advertised prices and actual sales prices for the Defendant Manufacturers' Guitars at different retailers are largely identical in most instances, despite the FTC action. This

includes all types of retailers, i.e., brick and mortar stores with or without online sales

alternatives, online sellers, and mass merchants who carry the Defendant Manufacturers' Guitars.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action individually and on behalf of a Class defined as

follows:

> All individuals and entities who purchased one or more new Guitars
> manufactured by Yamaha, Gibson, or Fender directly from Guitar Center
> and/or JOHN DOE Defendants 1-100, during the period January 2005
> through the present.

51.    **Numerosity**: Joinder of all Class members is impracticable.  While the size of the

Class is not yet known with certainty, based on the nature of the trade and commerce involved,

Plaintiff reasonably believes that the Class numbers potentially in the tens of thousands.  Class

members are geographically dispersed throughout the United States.  The Class members are

identifiable from information and records in Defendants' possession, as well as warranty and

other records.

52.    **Commonality**: Questions of law and fact are common to the Class, including, but

not limited to:

> a.    whether Defendants engaged in agreements, contracts, combinations, and
>
>        conspiracies, which had the purpose and/or effect of unreasonably
>
>        restraining competition and raising the retail price of Fender, Gibson and
>
>        Yamaha Guitars to prices higher than they would have been in the absence
>
>        of collusion;
>
> b.    whether Defendants unreasonably restrained trade;

c.    whether Defendants' anti-competitive contract, combination, and conspiracy have caused Plaintiff and the other members of the Class to suffer antitrust injury in the nature of paying more for the Guitars than they otherwise would have in a competitive market;

d.    the appropriate class-wide measure of damages; and

e.    whether Defendants' anti-competitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition.

53.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and other Class members are direct retail purchasers of new Guitars and were overcharged and thus injured by the same wrongful conduct of Defendants.  Defendants' violation of the antitrust laws, the effects of such violation, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

54.    **Adequacy**: As representatives of the Class, Plaintiff will fairly and adequately protect the interests of all Class members.  Plaintiff's counsel are among the most experienced antitrust and class action attorneys in the country.

55.    **Predominance**: The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members. Whatever possible difficulties may exist in the management of the class action are greatly outweighed by the advantages of the class action procedure.  Those advantages include, but are not limited to, providing Class members with a method for redress of claims that might otherwise not warrant individual litigation.

56.    **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute his or her common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually.  Class treatment also eliminates the potential for inconsistent adjudications.

## TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS

57.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

58.    Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the claims sued upon herein until at the earliest, when the FTC issued the Complaint and Consent Decree on April 18, 2009.

59.    Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

60.    Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment at private meetings set up by NAMM, Plaintiff and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

61.    Defendants continue to engage in their agreed-upon deceptive practices as enumerated above, and consequently, unwary consumers are injured on a daily basis by

Defendants' unlawful conduct.  Therefore, Plaintiff and the Class submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the Class purchased a new Guitar constitutes part of a continuing violation and operates to toll the statute of limitations in this action.

62.    Defendants are estopped from relying on any statute of limitations defense because of their illegal conduct.

63.    Defendants' conduct was and is, by its nature, self-concealing.  Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiffs and the Class from learning of their illegal, anti-competitive, unfair and/or deceptive acts.

64.    By reason of the foregoing, the claims of Plaintiff and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## CAUSE OF ACTION

**(Violation of Section 1 of the Sherman Act - 15 U.S.C. § 1 - Against All Defendants)**

65.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

66.    This claim is brought against Defendants pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, for damages sustained as a result of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

67.    Beginning as early as January 2005 and continuing through to the present, Defendants engaged in a contract, combination and conspiracy in restraint of interstate trade and

commerce in connection with the retail sale of new Guitars.

68.    The Agreement, and its enforcement, constitutes a contract, combination and conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the retail sale of new Yamaha, Gibson and Fender Guitars in the U.S., and harmed Plaintiff and the Class thereby.

69.    Defendants carried out a price fixing conspiracy in a way that was transparent and easy for each participant of the conspiracy to monitor through the adoption and enforcement of MAP pricing policies.

70.    Defendants formed this conspiracy at NAMM trade shows and events.  At these events, NAMM encouraged, coordinated, participated in and facilitated the Defendants' agreement relating to the retail prices of new Fender, Gibson and Yamaha Guitars.

71.    The Agreement harms competition by raising and increasing prices higher than they would have been in a free market, unfettered by Defendants' illegal agreement.

72.    Plaintiff and members of the Class were injured in their business or property by the collusion and conspiracy alleged above.

73.    Plaintiff and the other members of the Class have been forced to pay higher prices for new Guitars than they would have paid in the absence of Defendants' unlawful conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, respectfully requests that:

A.    The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

B.    The acts alleged herein be adjudged and decreed to be unlawful acts in violation of Section 1 of the Sherman Act and that Defendants be enjoined from further collusive conduct;

C.    Each member of the Class recovers threefold the damages determined to have been sustained by each of them, and that judgment be entered against Defendants in favor of the Class;

D.    The Class recover its costs of suit, including reasonable attorneys' fees and costs as provided by law; and

E.    That the Class be granted such other appropriate relief as may be determined to be just, equitable, and proper by this Court.

<u>**JURY DEMAND**</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

October 27, 2009

Michael D. Hausfeld (D.C. Bar No. 153742)
Hilary K. Ratway (D.C. Bar No. 481465)
**HAUSFELD LLP**
1700 K Street, NW
Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeldllp.com
        hscherrer@hausfeldllp.com

Jeffrey L. Kodroff
Jeffrey J. Corrigan
Jay S. Cohen
Jonathan M. Jagher
**SPECTOR ROSEMAN KODROFF**
**& WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300

Fax: (215) 496-6611
Email:   JKodroff@srkw-law.com
         JCorrigan@srkw-law.com
         JCohen@srkw-law.com
         JJagher@srkw-law.com

Jeffrey S. Goldenberg
**MURDOCK GOLDENBERG SCHNEIDER &
GROH, LPA**
35 East Seventh Street, Suite 600
Cincinnati, OH   45202
Telephone:  (513) 345-8291
Facsimile:  (513) 345-8294
Email:  jgoldenberg@mgsglaw.com

Mark S. Goldman
Brian D. Penny
**GOLDMAN SCARLATO & KARON, P.C.**
101 West Elm Street – Suite 360
Conshohocken, PA   19428
Telephone:  (484) 342-0700
Facsimile:  (484) 342-0701
Email:  Goldman@gsk-law.com

John P. McCarthy
**LAW OFFICES OF JOHN P. McCARTHY**
217 Bay Avenue
Somers Point, NJ   08244
Telephone:  (609) 653-1094
Facsimile:  (609) 653-3029
Email:  jpmcc57@aol.com

Philip A. Steinberg, Esquire
124 Rockland Avenue
Bala Cynwyd, PA   19004
Telephone:  (610) 664-0972
Facsimile:  (610) 664-3101
Email:  pasteinbe@aol.com

*Attorneys for Plaintiff*